**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.                                          No. 99-4581

DONALD S. PRITT,
            *Defendant-Appellant.*

UNITED STATES OF AMERICA,
            *Plaintiff-Appellant,*

v.                                          No. 99-4651

DONALD S. PRITT,
            *Defendant-Appellee.*

Appeals from the United States District Court
for the Southern District of West Virginia, at Parkersburg.
Joseph Robert Goodwin, District Judge.
(CR-98-176)

Argued: September 29, 2000

Decided: November 14, 2000

Before WILKINS and MOTZ, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

_____

Affirmed in part, vacated in part, and remanded for resentencing by
unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** James McCall Cagle, Charleston, West Virginia, for Appellant. Hunter P. Smith, Jr., Assistant United States Attorney, Charleston, West Virginia, for Appellee. **ON BRIEF:** Rebecca A. Betts, United States Attorney, Charleston, West Virginia, for Appellee.

---

**OPINION**

PER CURIAM:

In the mid to late 1980s, the appellant, Donald Pritt (Donald), was a successful podiatrist in West Virginia and Ohio.[1] During this time, however, he suffered several personal financial setbacks. To overcome these setbacks, Donald devised a scheme to defraud in which he submitted false claims to various insurance companies for injuries allegedly sustained in an all-terrain vehicle (ATV) accident on December 9, 1990. As part of this scheme to defraud, Donald brought a lawsuit in West Virginia state court against, among others, the ATV's manufacturer, Suzuki Motor Company, Limited (Suzuki), and the local dealer who sold him the ATV. This lawsuit falsely alleged, among other things, that the ATV accident was caused by Suzuki's negligence and that, as a result of the accident, Donald suffered severe, permanent physical and mental injuries, which forced him to walk in a stooped fashion with the assistance of a cane. During discovery, Donald proffered numerous false discovery responses to the defendants. A mistrial was declared after videotapes were played at trial showing Donald executing mentally and physically demanding activities, and the state court reserved ruling on final dismissal of the lawsuit pending the filing of motions for attorneys' fees.

Facing substantial claims for attorneys' fees, Donald devised a second scheme to defraud. This scheme involved his efforts to defraud Suzuki's counsel, as well as his own, out of over $600,000 in attor-

---

[1]Donald was born in October 1932. He began his career as a podiatrist in West Virginia and Ohio in 1957.

neys' fees by fraudulently transferring and concealing ownership of assets.

On September 30, 1998, a federal grand jury sitting in the Southern District of West Virginia indicted Donald and his son, Thomas Pritt (Thomas), on fourteen counts of mail fraud, and aiding and abetting the same, in violation of 18 U.S.C. §§ 1341 and 2. The mail fraud counts involved two schemes to defraud. The first scheme involved the submission of false claims to insurance companies (Counts One and Six through Eleven) and various fraudulent discovery responses in the fraudulent lawsuit against Suzuki (Counts Two through Five). The second scheme involved a scheme to defraud various individuals and corporations out of the attorneys' fees ordered after the Suzuki trial and was charged in Counts Twelve through Fourteen. Donald and Thomas were also indicted on three counts (Counts Eighteen through Twenty) of various money laundering offenses. In addition, Donald was indicted on one count (Count Fifteen) of making a false claim for Social Security disability benefits in violation of 18 U.S.C. § 287, and two counts (Counts Sixteen and Seventeen) of bankruptcy fraud in violation of 18 U.S.C. § 152(3).

The case went to trial on February 24, 1999. After the government and the defendants completed their cases, the defendants moved for a judgment of acquittal on all counts. The district court granted the motion in part, but denied it in part. With respect to Donald, the district court granted the motion as to counts Twelve, Fourteen, and Eighteen through Twenty, but denied it as to the remaining counts. With respect to Thomas, the district court granted the motion as to Counts One, Six through Fourteen, and Eighteen through Twenty, but denied it as to the remaining counts.

On March 5, 1999, the jury convicted Donald on Counts One through Eleven, Thirteen, and Fifteen through Seventeen, but acquitted Thomas of all of the remaining counts against him (Counts Two through Five). On March 12, 1999, Donald moved for a new trial, arguing, among other things, that the jury's verdict was against the weight of the evidence. On August 3, 1999, the district court granted Donald's motion for a new trial on Counts One through Eleven and Fifteen, but denied it on Counts Thirteen, Sixteen, and Seventeen. The district court sentenced Donald to thirty months' imprisonment,

ordered him to serve a three-year term of supervised release, ordered restitution of $193,909.38, and ordered Donald to pay special assessments totaling $300. Both Donald and the government separately filed timely notices of appeal.

On appeal, the government argues that the district court erred when it granted in part Donald's motion for a new trial. Donald challenges the sufficiency of the evidence on Counts Thirteen and Seventeen, and argues that the district court erred when it refused to give his proposed diminished capacity instruction. For the reasons stated below, we agree with the government that the district court erred when it granted Donald a new trial on Counts One through Eleven and Fifteen, and disagree with Donald's contentions that there is insufficient evidence to support his convictions on Counts Thirteen and Seventeen and that the district court erred when it refused to give his proposed diminished capacity instruction. Accordingly, the judgment of the district court is affirmed in part, vacated in part, and the case is remanded for resentencing.

I

In the mid to late 1980s, Donald operated a successful podiatry practice in West Virginia and Ohio. During this time, however, he suffered several personal financial setbacks. For example, following a 1988 audit, the Internal Revenue Service (IRS) assessed a tax delinquency of $250,000 plus interest and penalties against Donald. To meet this obligation, Donald had to liquidate a retirement account and an annuity in early 1990, suffering penalties for early withdrawal and incurring additional IRS tax liabilities. In addition, during the late 1980s, Donald's wife, Charlene Pritt (Charlene), filed for divorce, and, in December 1989, the state court awarded her $925 per week in alimony and child support.[2] During this time period, Donald also was being sued by several patients for malpractice.

Notwithstanding his financial woes, in the late 1980s, Donald began applying for numerous life, business overhead, and disability insurance policies. In all, Donald made over thirty applications for

---

[2]From a previous marriage, Donald was paying $800 per month in child support.

insurance; twenty-one were made between March 31, 1989 and December 1, 1990. For the nineteen policies issued,[3] Donald incurred annual insurance premiums of approximately $100,000, but in the event of an accidental disability stood to make $30,175 per month in disability income benefits and $30,000 per month in business overhead benefits. Donald also obtained life insurance coverage of $4.3 million, most of which was accumulating cash value maintained by the insurers due to Donald's decision to pay for disability premium waivers.

In order to get such extensive insurance coverage, Donald made numerous misrepresentations to the insurance companies. In general, he failed to disclose the existence of other policies and applications, of declinations and cancellations of policies, and of his history of psychiatric treatment.

On December 9, 1990, Thomas and his friend, Darren Anderson (Anderson), were riding ATVs near Parkersburg, West Virginia. Shortly after noon on that day, Donald and Thomas expressed the idea of going to Elkins, more than two hours from Parkersburg, to ride ATVs. The three left Parkersburg a short time later and arrived at Elkins after dark.

When Donald, Thomas, and Anderson arrived in Elkins, they parked at the bottom of a steep hill. Donald's ATV was unloaded first. After his ATV was unloaded, Donald, an inexperienced ATV operator, started it, turned on its headlights, and rode off alone on a trail leading up the hill. Anderson and Thomas followed approximately ten minutes later, but, after riding for a few minutes, they could not find Donald. In an effort to find Donald, Anderson and Thomas separated, but, during that search, they still failed to find Donald. After they rejoined, Anderson and Thomas continued to search for Donald on the hill's trails. A short time later, Anderson heard Donald screaming for help.

After they parked their ATVs, Anderson and Thomas descended over a steep portion of the hill to where Donald lay. Anderson stayed

---

[3]Some of the applications were rejected because they were incomplete or because Donald was deemed overinsured.

with Donald, and Thomas went to get help. Donald was complaining of pain in his neck and back. Despite apparently falling forty to fifty feet off the trail, Donald did not lose consciousness and suffered no broken bones, bruises, lacerations, or torn clothing.

After initial treatment at Elkins Hospital, Donald was transported to a hospital in Morgantown, West Virginia. X-rays and a CT scan revealed no fractures but showed degenerative arthritis of the lumbar and thoracic spine and narrowing of the disc spaces between vertebrae. The record shows that these degenerative conditions were related to aging and were not related to trauma caused by any accident.

After the ATV accident, Donald began filing claims against his insurance policies. By the time of Donald's trial in this case, he had received $1,689,766.87 in benefits and owned insurance policies with a cash value of $233,099.91.[4]

Around February 1991, Donald applied for Social Security disability benefits with the Social Security Administration (SSA), claiming that he was permanently and totally disabled and unable to perform work as a result of injuries he received in his ATV accident on December 9, 1990. By the time of trial, Donald had received $87,027 in Social Security disability benefits.

At trial, the government produced evidence demonstrating that on applications submitted to the West Virginia Board of Medicine in July 1991, Donald stated that in the two-year period ending June 30, 1991, he had suffered no physical or mental injury or disease that might reasonably be expected to affect his ability to practice podiatry safely and with competence.

---

[4]Some of these benefits were payments under a business overhead expense policy issued by the New England Life Insurance Company. These benefits were based upon Donald's claim that, although disabled, he had two offices open. However, an investigator came to West Virginia on August 17, 1992, to see if these offices were in fact open and found that both offices were vacant.

In October 1992, Donald sued Suzuki and others in West Virginia state court for the psychiatric and physical damages resulting from his purported ATV accident. In preparation for trial, Donald submitted sworn interrogatories denying that he had ever had psychiatric counseling, care, or attention. In his deposition, Donald described his injuries at great length and stated that he could neither bend, squat, nor stoop.

Suzuki's lawyers hired a private detective to conduct surveillance to videotape Donald engaged in activities that would contradict his testimony in regard to the severity of his injuries. This strategy was successful, and Donald was filmed riding in high-speed motorboats, climbing in and out of boats, helping two others carry a boat up a hillside, throwing objects, walking upstairs and across his steep backyard, repeatedly trying to start gasoline powered pumps by pulling the starter cord, carrying those pumps with his cane tucked under his other arm, using a fire hose connected to the pump to clean his dock, bending, squatting, stooping, and even lying down and holding the hose under the dock.[5]

In further preparation for trial, Suzuki's lawyer asked Dr. Colin Craythorne, who had done an independent medical examination of Donald and found him disabled, to reexamine Donald, asking him certain questions. Donald was asked those questions by Dr. Craythorne's nurse, and, despite videotaped evidence to the contrary, denied being able to walk uphill or downhill, across the contour of a hill, or any distance without the use of a cane or a walker. Donald denied being able to climb steps without the use of a cane, carry an object without the use of a cane, grip and lift an object with his right hand, bend to pick up an object, or start a gasoline motor equipped with a pull cord.

Shortly before the trial of Donald's lawsuit against Suzuki, Suzuki learned that Donald had been under the psychiatric care of Dr. Robert

---

[5]At the trial in the case now before the court, a West Virginia Division of Natural Resources law enforcement officer testified that in June 1992 Donald had helped him recover a sunken boat from the Little Kanawha River by diving with full scuba gear into black water, locating the boat, and diving again to attach a steel chain to the boat.

Ovington, a psychiatrist, from approximately April 1986 until June 1994.[6] Based upon that, Suzuki moved to exclude evidence of Donald's psychiatric and psychological condition and related damages, and the state court granted that motion.

On the eve of the trial of Donald's lawsuit against Suzuki, Donald filed a motion to continue and, when that motion was denied, he committed himself to a hospital's psychiatric unit. Thomas petitioned for appointment as guardian *ad litem* for Donald in the prosecution of the lawsuit against Suzuki, and the case went to trial on July 21, 1994.

Thomas was the first and only witness in the case. On cross-examination, Thomas was asked about his knowledge of Donald's disabilities, questions obviously patterned on the videotaped activities of Donald. Suzuki's counsel then prepared to cross-examine Thomas by playing the videotape. The state court viewed the videotape before it was shown to Thomas.

On the following day, based upon its review of the videotape, the state court declared a mistrial, reserving ruling on final dismissal of the lawsuit pending the filing of motions for attorneys' fees and costs. The state court entered an order confirming its ruling in September 1994 and subsequently entered an order on July 21, 1995, awarding Suzuki and the associated defendants attorneys' fees totaling $396,255 and awarding Donald's counsel attorneys' fees of $211,234.[7]

After the Suzuki lawsuit debacle, facing claims for attorneys' fees, Donald began cashing in certain personal investments and transferring the proceeds to his children. Donald used these funds to purchase

---

[6]Donald met with Dr. Ovington forty-four times between April 1986 and June 1994. Most of the sessions concerned Donald's marital problems. However, during a session on October 9, 1990, Donald expressed concern that he owed the IRS in excess of $380,000 and stated that, the previous week, he closed a restaurant he owned because the restaurant lost $80,000 in 1990.

[7]The award of attorneys' fees was affirmed *in toto* by the West Virginia Supreme Court of Appeals. *See Pritt v. Suzuki Motor Company*, 513 S.E.2d 161 (W. Va. 1998).

multiple cashiers checks in his children's names and then used those checks to pay debts he owed to certain creditors.

For example, in January 1995, Donald prematurely cashed out an annuity with Aetna Life Insurance (Aetna), incurring a significant penalty for the early withdrawal. On January 11, 1995, Aetna mailed to Donald through the United States Postal Service a check for $34,360.34. Donald deposited $30,000 from the Aetna check into a joint account he maintained with his minor son, Donald Pritt, Jr. (Donald Jr.). Following a transfer on April 18, 1995 into Thomas' brokerage account, the money was transferred into Donald Jr.'s brokerage account, and on May 19, 1995, Donald wrote a check on that account for $29,997.65 payable to Donald Jr. Donald used that check to purchase five cashiers checks payable to his minor son.

On July 31, 1995, ten days after the attorneys' fees order was entered by the state court and before Donald's creditors could execute on that order, Donald filed a petition for bankruptcy protection in the United States Bankruptcy Court for the Southern District of West Virginia. On August 14, 1995, Donald filed in the bankruptcy court a statement of financial affairs, wherein he was required to list gifts or transfers of more than $100 in the previous year. Donald omitted from the statement of financial affairs the payment of $83,663.44 to Thomas on February 13, 1995, the payment of $30,000 to Thomas on April 18, 1995, and the payment of $53,326.94 to Thomas on May 11, 1995.

On August 14, 1995, Donald filed a schedule of personal property in the bankruptcy court. On that schedule, Donald stated that he had no interest in insurance policies. However, Donald failed to disclose that he owned a life insurance policy with a cash surrender value of approximately $27,000.

II

The government argues that the district court erred in granting Donald a new trial on Counts One through Eleven and Fifteen. Under Rule 33 of the Federal Rules of Criminal Procedure, the district court can grant a new trial on a motion of the defendant "if the interests of justice so require." Fed. R. Crim. P. 33. During its consideration of

a motion under Rule 33, the district court may weigh the evidence and may assess the credibility of witnesses. *See Tibbs v. Florida*, 457 U.S. 31, 37-38 (1982). Our review of the district court's grant or denial of a motion for new trial is for an abuse of discretion. *See United States v. Wilson*, 118 F.3d 228, 237 (4th Cir. 1997). A district court should exercise its discretion to grant a new trial "sparingly," *United States v. Arrington*, 757 F.2d 1484, 1486 (4th Cir. 1985), and the district court's rejection of all or part of the testimony of a witness does not automatically entitle a defendant to a new trial. *See United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). The district court should grant a new trial based on the weight of the evidence "only when the evidence weighs heavily against the verdict." *Arrington*, 757 F.2d at 1486. In other words, the "evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *United States v. Robertson*, 110 F.3d 1113, 1118 (5th Cir. 1997). Our discussion will begin with Counts One through Eleven and then turn to Count Fifteen.

A

To establish a violation of 18 U.S.C. § 1341, the government must prove beyond a reasonable doubt "(1) the existence of a scheme to defraud, and (2) the mailing of a letter, etc., for the purposes of executing the scheme." *United States v. Loayza*, 107 F.3d 257, 260 (4th Cir. 1997) (citations and internal quotation marks omitted). In order to establish the scheme to defraud element, the government must prove beyond a reasonable doubt that the defendant acted with specific intent to defraud. *See United States v. Ham*, 998 F.2d 1247, 1254 (4th Cir. 1993).

In this case, the indictment describes the first mail fraud scheme to defraud (Counts One through Eleven) as follows:

*Scheme to Defraud*

3.   Beginning in or about 1987 and continuing through at least September 30, 1998, defendant DONALD S. PRITT, aided and abetted by defendant THOMAS S. PRITT, did devise and intend to devise a scheme and artifice to defraud numerous insurance companies, as well as Suzuki Motor

Corporation and others, of substantial monies to which defendant DONALD S. PRITT was not entitled by falsely claiming that defendant DONALD S. PRITT had suffered serious and permanent bodily injury in a purported December 1990 accident involving a Suzuki All-Terrain-Vehicle (hereafter "ATV").

In its instructions to the jury, the district court instructed the jury that the first mail fraud scheme devised by Donald involved a scheme to defraud "insurance companies and Suzuki Motor Corporation by falsely claiming to have suffered serious and permanent bodily injury in a purported December 1990 accident involving an ATV."

The district court held that the jury's verdict on Counts One through Eleven was against the weight of the evidence because the testimony of one of the government's witnesses, Richard Pence (Pence), "was wholly incredible as a matter of law." According to the district court, without his testimony, there was no evidence to support the jury's finding that the ATV accident was "faked" or "staged." Without evidence to support this jury finding, the district court opined that the government could not meet its burden of proof on the scheme to defraud element, and, therefore, the jury's verdict on Counts One through Eleven was against the weight of the evidence.

At trial, the district court allowed the government to use the partially redacted videotaped deposition of Pence as evidence in its case-in-chief.[8] Through his videotaped deposition, Pence, a disbarred lawyer, and a former friend and business associate of Donald's, testified that, prior to December 9, 1990, Donald had told him on several occasions that he was suffering from an arthritic back. Pence also testified that Donald told him that he was going to fake an accident by falling off a ladder in order to claim various insurance benefits, that Donald later told him that he was planning to have an accident on a boat instead, and that Donald finally told him that he had decided to have an accident on an ATV in the woods. Pence testified that, after

---

[8]This deposition was given in a case brought by Donald against Mutual of Omaha Insurance Company, a company in which Donald applied for long-term disability insurance approximately nine days before the ATV accident.

December 9, 1990, he had observed Donald engage in a variety of physical activities inconsistent with his claim of total disability.

Pence was cross-examined regarding ethically questionable actions he had taken as a lawyer, and as a disbarred lawyer, which led to his loss of his law license and the denial of his reapplication for a law license. Pence was also questioned about his involvement on behalf of Charlene in Charlene and Donald's divorce proceeding, about his financial relationships with Donald, and about his involvement in Donald's bankruptcy. During this questioning, Pence made several inconsistent statements. Pence was also asked whether he had destroyed security cameras while trespassing on Donald's property. Pence testified he did not recall destroying any such property. In the deposition, Pence was confronted with photographs of him and his son carrying a ladder, of Pence on the ladder wearing what appeared to be surgical gloves, and of a broken security camera.

We believe it was an abuse of discretion for the district court to order a new trial on Counts One through Eleven. First, the district court's decision rests on the erroneous legal conclusion that the government was required to prove that Donald faked the ATV accident. The indictment alleges that Donald's scheme to defraud stemmed from a "purported" ATV accident. Purported means "reputed or claimed; alleged." Random House Webster's College Dictionary 1075 (2000). The indictment only states that the ATV accident was alleged by Donald to have occurred. That allegation merely required the government to prove that Donald used the accident, faked or not, to claim injuries that he did not in fact sustain.[9]

To be sure, to convict Donald of mail fraud, the government had to prove beyond a reasonable doubt that Donald engaged in a scheme to defraud. As alleged in the indictment, this scheme was based on Donald's false claims of injury from the "purported" ATV accident,

---

[9]It is also worthy to note that the indictment does not state that the accident was faked, and the district court did not instruct the jury that it had to find that the accident was faked. Furthermore, Donald did not request a jury instruction instructing the jury that the government was required to prove beyond a reasonable doubt that the accident was faked, nor did he object to the instructions given to the jury on this point.

which enabled him to fraudulently obtain money from his insurance companies and Suzuki. Obviously, if the government proved that the ATV accident was faked, it made its assertion that Donald's claims of injury were fraudulent more persuasive. But, by no means did the government's case rise or fall on proof that the ATV accident was faked.

With the government's burden of proof viewed in its proper perspective, it is evident that the jury's finding that Donald engaged in a scheme to defraud his insurance companies and Suzuki out of substantial monies by making false claims of injury was not against the weight of the evidence. Following the ATV accident, Donald repeatedly demonstrated (on videotape and in the presence of witnesses) his ability to perform tasks no totally disabled person could perform, and he repeatedly and consistently lied about his indisputable ability to perform these tasks. Comparing this evidence and the evidence recited below, which demonstrates beyond a reasonable doubt that Donald faked the ATV accident, to Pence's testimony and the minimal role it played in the trial leads to the inescapable conclusion that the district court erred when it determined that the jury's verdict on Counts One through Eleven was against the weight of the evidence.

Second, even if we assumed (1) the government was required to prove that the ATV accident was "faked" or "staged," and (2) the jury made such a finding, we would still conclude that it was an abuse of discretion for the district court to order a new trial on Counts One through Eleven. Contrary to the district court's intimation, the government's case demonstrating that the ATV accident was faked was not built around the testimony of Pence; rather it was built around a series of events occurring both before and after the accident that demonstrated beyond a reasonable doubt that Donald faked the ATV accident in order to obtain disability benefits. First, the government demonstrated that Donald had financial and personal motives for faking an ATV accident; at the time of the accident, Donald was under financial duress and his retirement prospects were poor in view of the fact that he had to liquidate a retirement account and an annuity in order to meet his IRS tax liability. Second, the government demonstrated that Donald, through a series of misrepresentations, applied for an enormous amount of insurance, thereby putting himself in the position to benefit financially from a disabling accident. Donald obtained

insurance coverage that would have cost him more than $100,000 per year in premiums, but would have paid him more than $60,000 per month in case of disability due to an accident. Third, the timing of Donald's applications for insurance is suspect. Donald was applying for an enormous amount of insurance at the same time his personal debts, *e.g.*, tax liability and alimony/child support obligations, were growing. Fourth, after securing all of this insurance coverage throughout 1989 and 1990, Donald promptly had an accident under suspicious circumstances.[10] Fifth, despite avoiding any objective injury, Donald claimed that he was totally disabled on account of the accident, yet he repeatedly demonstrated (on videotape and in the presence of witnesses) his ability to perform tasks no totally disabled person could perform. Finally, Donald repeatedly and consistently lied about his indisputable ability to perform these tasks. All of this evidence, which the district court completely ignored, was the heart of the government's case against Donald and overwhelmingly supports the jury's finding that Donald faked the ATV accident.

This case is not about Pence. Even if one assumes *all* of his testimony was unbelievable as a matter of law, when one examines the evidence described above against Pence's testimony (which was largely discredited) and the government's minimal reliance on Pence's testimony, it is evident that the district court abused its dis-

---

[10]Undoubtedly, the jury was entitled to draw the inference that the circumstances surrounding the ATV accident suggested that the ATV accident was faked and that Donald used Anderson as a pawn in his scheme to defraud. Donald, an inexperienced ATV operator, agreed to ride his ATV on a steep hill in the dark in the middle of the winter. While the location Donald chose to ride his ATV is only nominally suspicious, the conditions (dark winter evening), which made it extremely difficult for Donald to get caught faking an accident, get the foul play ball rolling. When Donald, Tommy, and Anderson arrived at the hill, Donald rode off alone on a trail up the hill leaving Tommy and Anderson behind. This unusual act, an inexperienced ATV operator riding off alone on a trail up a steep hill in the dark, gave Donald the opportunity he needed to fake the accident. Finally, the jury was entitled to draw the inference that Anderson was coaxed into going on this trip because Donald needed a non-family member to be there to find him "injured" after he faked the accident.

cretion when it concluded that the jury's finding that the ATV accident was faked was against the weight of the evidence.

B

The district court also granted a new trial on Count Fifteen, which alleged that Donald filed a false claim with the SSA in February 1991. The indictment alleged that, in February 1991, Donald

> applied for Social Security Disability benefits from the Social Security Administration based on his false and fraudulent written claim that he was permanently and totally disabled and unable to perform work as a result of injuries he received in an ATV accident on December 9, 1990.

In its instructions to the jury, the district court correctly instructed the jury that to convict Donald on Count Fifteen it was required to find beyond a reasonable doubt that Donald: (1) made a false or fraudulent claim with the SSA; (2) knew the claim was false or fraudulent when it was made to the SSA; and (3) the false or fraudulent claim was material.

In granting Donald a new trial on this count, the district court held that the jury's verdict was against the weight of the evidence. In reaching this conclusion, the district court noted that the weight of the evidence produced at trial demonstrated that the ATV accident was not faked and that Donald is disabled and was disabled at the time he made his application for Social Security disability benefits. According to the district court, "the weight of the medical evidence is overwhelming that [Donald] is and was disabled."

Initially, we note that the question before the jury was not whether Donald was disabled, but whether in February 1991 Donald was permanently and totally disabled and unable to perform work as a result of injuries he purportedly received in the ATV accident. And a review of the evidence in this case leads to the inescapable conclusion that the district court abused its discretion when it concluded that the jury's finding that Donald made a false claim for Social Security disability benefits in February 1991 was against the weight of the evidence.

The government introduced overwhelming evidence that Donald was not disabled from the ATV accident. As noted above, the government introduced evidence which demonstrated (on videotape and in the presence of witnesses) Donald's ability to perform tasks no totally disabled person could perform, and Donald repeatedly and consistently lied about his indisputable ability to perform these tasks. Against this evidence was the testimony of the physicians called by Donald, who testified that Donald was, in fact, disabled. However, some of these physicians did not have the benefit of the videotaped evidence prior to making their opinions. Furthermore, at least two mental health professionals opined that Donald appeared to be deliberately performing poorly on psychological tests administered to him. Thus, while some of Donald's physicians testified that he was disabled, it cannot be said, under any standard of review, that the jury's verdict on Count Fifteen is against the weight of the evidence.

## III

Donald argues that there is insufficient evidence in the record to support his convictions on Counts Thirteen and Seventeen. In reviewing a sufficiency of the evidence claim on direct review, we must sustain the conviction if the record contains "substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States*, 315 U.S. 60, 80 (1942). In applying this standard, we give due regard to the jury's prerogative to resolve questions of credibility. *See United States v. Burgos*, 94 F.3d 849, 862-63 (4th Cir. 1996) (*en banc*). We must consider circumstantial as well as direct evidence, and allow the government the benefit of all reasonable inferences from the facts proven to those sought to be established. *See United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982). "[A]n appellate court's reversal of a conviction on grounds of insufficient evidence should be confined to cases where the prosecution's failure is clear." *United States v. Jones*, 735 F.2d 785, 791 (4th Cir. 1984) (citation and internal quotation marks omitted). We shall first address the sufficiency of the evidence on Count Thirteen and then proceed to Count Seventeen.

## A

For his participation in the second mail fraud scheme, which involved the scheme to defraud various individuals and corporations

out of the attorneys' fees ordered at the Suzuki trial, Donald was convicted of one count (Count Thirteen) of mail fraud. Count Thirteen involved an annuity Donald had with Aetna.

In support of Count Thirteen, the government introduced evidence demonstrating that, in the Suzuki trial on September 24, 1994, the West Virginia state court entered an order declaring a mistrial and reserving ruling on final dismissal of the lawsuit pending the filing of motions for attorneys' fees. In October 1994, Donald purchased an annuity with Aetna, and, in January 1995, he prematurely cashed out the annuity, incurring a significant penalty for the early withdrawal. On January 11, 1995, Aetna mailed to Donald through the United States Postal Service a check for $34,360.34. The government also introduced evidence demonstrating that Donald deposited $30,000 from the Aetna check into a joint account he maintained with his minor son, Donald Jr. Following a transfer on April 18, 1995 into Thomas' brokerage account, the money was transferred into Donald Jr.'s brokerage account, and on May 19, 1995, Donald wrote a check on that account for $29,997.65 payable to Donald Jr. Donald used that check to purchase five cashiers checks payable to his minor son. The order awarding attorneys' fees was entered by the West Virginia state court on July 21, 1995.

Donald argues that, because Aetna mailed the check cashing out his annuity before the judgment for attorneys' fees was entered, he could not possibly have had the intent to defraud at the time of the mailing. This argument lacks merit for the simple reason that a rational juror could believe that after it became apparent that he faced a judgment for attorneys' fees, but before the order was actually entered, Donald began transferring his assets, including his Aetna annuity, as part of his scheme to hide those assets from his creditors. Accordingly, we conclude there is substantial evidence in the record to support Donald's conviction on Count Thirteen.

## B

Donald was convicted of two counts (Counts Sixteen and Seventeen) of bankruptcy fraud in violation of 18 U.S.C. § 152(3).[11] Specif-

---

[11]A person is guilty of a § 152(3) violation if he

knowingly and fraudulently makes a false declaration, certifi-

ically, Donald was convicted of "knowingly and fraudulently" making two false declarations in his bankruptcy case; Count Sixteen related to certain undisclosed money transfers, and Count Seventeen related to his failure to disclose that he had an interest in, among other things, a whole life insurance policy with a cash surrender value of approximately $27,000. At trial, the district court correctly instructed the jury on the elements of bankruptcy fraud.[12]

Donald argues that there is insufficient evidence in the record to support his conviction on Count Seventeen, which alleged that he omitted in his statement of personal property, among other things, his interest in a whole life insurance policy with a cash surrender value of approximately $27,000. The gist of Donald's argument is that the evidence of the value of the whole life insurance policy was inconclusive, that the government failed to prove that he was actually aware of that value, and that he did not have an interest in the policy when he filed for bankruptcy.

There is sufficient evidence in the record to support Donald's conviction on Count Seventeen. Donald filed for bankruptcy in July 1995. On August 14, 1995, in the bankruptcy case, Donald filed a schedule of personal property, which stated that he had no interest in any insurance policies. At trial, the government produced evidence concerning two life insurance policies owned by Donald, namely, a universal life insurance policy, and a renewable term life insurance

---

cate, verification, or statement under penalty of perjury . . . in or in relation to any case under title 11.

18 U.S.C. § 152(3).

[12]The district court set forth the following elements of a § 152(3) violation:

One, that there existed a proceeding in bankruptcy on or about the date alleged in the indictment; two, that the defendant knowingly made or caused to be made a false declaration or statement in that bankruptcy proceeding or in relation to it; three, that the defendant knew that the statement or declaration was false; four, that the declaration or statement related to a material matter; and five, the declaration or statement was made under penalty of perjury.

policy, which was later converted to a whole life insurance policy. The government also produced evidence that, on July 31, 1995, the whole life insurance policy had a cash surrender value of $27,323.54, and that one of Donald's insurance agents had discussed with Donald the cash value of his policies. Finally, the government produced evidence demonstrating that Donald transferred ownership of this policy in September 1995, after the filing of the schedule of personal property, by convincing the insurance company to back date the change of ownership by three years. Based on this evidence, we conclude there is substantial evidence in the record to support Donald's conviction on Count Seventeen.

## IV

Donald contends that the district court erred in refusing to give his proposed diminished capacity instruction. Donald's proposed instruction states:

> There has been testimony that the Defendant Donald S. Pritt suffers from severe depression which can cause poor memory and the inability to concentrate. In connection with this evidence, you are instructed that this alone is not a defense; however the fact that a person may have been in a state of severe depression at the time of an act may negate the existence of a specific criminal intent. If the evidence in this case leaves the jury with a reasonable doubt whether, because of the severe depression, the mind of the Defendant Donald S. Pritt, the mind of the defendant [sic] was capable of forming or did form the specific intent the jury should acquit Donald S. Pritt.

A district court's refusal to provide an instruction requested by a defendant constitutes reversible error only if the instruction: "(1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *United States v. Lewis*, 53 F.3d 29, 32 (4th Cir. 1995) (citation and internal quotation marks omitted). Before applying this test, we must consider a threshold question:

whether the defendant presented an adequate evidentiary foundation to support the proposed instruction. *See id.* at 33 n.8.

The district court refused to give Donald's proposed instruction on the basis that there was insufficient evidence in the record to support the instruction. We have reviewed the entire record in this case and agree with the district court's conclusion that there was insufficient evidence presented at trial to warrant a diminished capacity instruction.[13]

V

For the reasons stated herein, the judgment of the district court is affirmed in part, vacated in part, and the case is remanded for resentencing.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED FOR RESENTENCING*

---

[13]With respect to Donald's argument, we assume, without deciding, that the law requires a diminished capacity instruction when a defendant presents sufficient evidence to support the instruction.